IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.   Crim. No. 02-1022 MCA

TROY RUBEN MELGOZA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

On July 18, 2002, the Defendant filed a Motion to Suppress (Doc. No. 19). On August 1, 2002, I held a hearing on the Motion to Suppress. Present at the hearing was the Defendant and his counsel, Robert Harris. The United States was represented by Assistant United States Attorney Randy Castellano. At the conclusion of the hearing, I ordered the parties to submit additional briefing. That briefing is now complete. Having reviewed the state court transcript[1], the transcript of the August 1, 2002 hearing, the briefs, and the relevant law, I find that the Motion to Suppress should be denied.

A. Background

The Defendant is charged with possessing with the intent to distribute less than 50 kilograms of marijuana. The Defendant is also charged with aiding and abetting. These charges arise from a seizure of approximately 93 pounds of marijuana which occurred on August 8, 2001, in Alamogordo, New Mexico.

---

[1] This case was first prosecuted in state court. The state court held an evidentiary hearing on the Defendant's motion to suppress and granted the motion to suppress.

At about 9:00 or 9:30 a.m., the Defendant was driving a pickup truck with a Kansas license plate northbound on U.S. Highway 54 as it enters the City of Alamogordo. The Defendant was traveling away from the Mexican border. The Defendant stopped at an intersection beside an Immigration and Naturalization Service agent who was driving a marked car. The agent looked toward the Defendant and observed the Defendant raise his hand beside his face. The agent interpreted this action as an attempt by the Defendant to hide his face. The Defendant did not look at the agent again. The agent was aware that drug and alien smuggling had increased on U.S. Highway 54 within the previous two weeks because the permanent border patrol checkpoint on U.S. Highway 54 south of Alamogordo had been closed for construction. The agent then ran a 72-hour lane check which disclosed that the Defendant had crossed from the United States into the Republic of Mexico two times within the previous three days.

After leaving the intersection, the Defendant proceeded northward and pulled into a Wendy's parking lot and then drove back out onto the street without stopping to purchase anything. Based on his experience, the agent interpreted this action as an evasive driving maneuver. The Defendant then pulled into a Burger King parking lot and parked diagonally across the marked parking spaces. The agent pulled in beside the Defendant and asked the Defendant if he could talk with him. The Defendant agreed to talk to the agent. The agent then moved his car behind the Defendant's pickup truck so that the agent's car would not block the entrance to the Burger King parking lot and turned on the car's overhead emergency lights. This action apparently blocked the pickup truck so that it could not leave the parking lot. The agent's car overhead emergency lights remained on while the car was parked behind the Defendant's pickup truck.

The agent asked to see the Defendant's driver's license and the pickup truck's registration. The agent also asked the Defendant questions about his citizenship and whether he had been to Mexico recently. The agent did not find any irregularities with the Defendant's driver's license, the pickup truck's registration, or the Defendant's declaration of citizenship. The agent, however, noted that the Defendant made several contradictory statement regarding his visits to Mexico within the previous three days. The agent testified during the state suppression hearing that he also observed that the Defendant's hands were shaking and that the Defendant had to swallow before answering questions. The Defendant denied at the state suppression hearing that his hands were shaking.

The agent then asked the Defendant for consent to look in the pickup truck. The Defendant apparently responded by shrugging his shoulders. The Defendant exited the pickup truck and left the pickup truck keys in the pickup truck. The agent did not find anything suspicious in the pickup truck but had concerns about whether the gas tank had been tampered with because he could not see the gas tank very well. Consequently, the agent called a canine unit to further investigate the possibility that the Defendant had concealed drugs in the pickup truck. The agent testified at the state suppression hearing that the Defendant affirmatively consented to the canine investigation. The Defendant contends that he merely acquiesced to the canine's presence because of the agent's show of authority.

While the agent and the Defendant were waiting for the canine unit to arrive, the Defendant went into the Burger King to buy breakfast and use the restroom, activities which the Defendant had told the agent were the reasons for his stopping at the Burger King. The Defendant came out of the Burger King with his breakfast just as the canine unit arrived. The dog

subsequently alerted to the rear end of the pickup truck. The agent and the canine unit officer noticed that the spare tire would not fit the pickup truck's wheels. After feeling the spare tire and detecting packages in the tire, and having poked a hole in the spare tire, the agent and the canine unit officer discovered approximately 93 pounds of marijuana in the spare tire.

B. Discussion

The following issues were raised in the Motion to Suppress and at the August 1, 2002 hearing.

-- Was the initial encounter consensual after the agent blocked the Defendant's pickup truck?

-- Was the initial encounter consensual even if the Defendant could not drive his pickup truck out of the Burger King parking lot because Defendant was allowed to go about his business, i.e., get breakfast and use the restroom?

-- Was blocking the Defendant's pickup truck a Terry or investigative stop requiring reasonable suspicion?

-- Did the initial stop develop into an arrest requiring probable cause?

-- Was the search of the pickup truck conducted without the effective consent of the Defendant?

1. Was the initial encounter consensual after the agent blocked the Defendant's pickup truck?

"Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely be approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 122 S.Ct.

4

2105, 2110 (2002). An encounter between police and a citizen, however, is not consensual and therefore subject to Fourth Amendment protection "when, considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *United States v. King*, 990 F.2d 1552, 1556 (10th Cir. 1993)(citation omitted).

The Defendant argues that once the agent moved his car behind the Defendant's pickup truck in the Burger King parking lot, the encounter between the Defendant and the agent ceased to be consensual. The Defendant argues that having his pickup truck blocked provided him with an objective reason for believing he could not end the conversation with the agent and go on his way. *See United States v. Green*, 111 F.3d 515, 520 n.1 (7th Cir.), *cert. denied*, 522 U.S. 973 (1997)(police car blocking the exit of a person's vehicle constitutes a Terry stop, not a consensual encounter). The United States argues, however, that the agent's act of blocking the Defendant's pickup truck was done in the agent's capacity as a community caretaker and so the Fourth Amendment is not applicable. The United States contends that the agent moved his car to the position behind Defendant's pickup truck in order to avoid blocking the entrance to the Burger King parking lot. The United States also contends that the agent activated his car's overhead lights to make sure no one driving into the parking lot would "T-bone" the Defendant's pickup truck.

For an officer to detain a person in the course of conducting community caretaking activities, the detention must be reasonable and based on "specific articulable facts...." *King*, 990 F.2d at 1560. Moreover, the court must "balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free

5

from arbitrary government interference." *Id*. (citations omitted). In this case, the agent had "specific articulable facts" supporting his decision to move his car and to activate his overhead lights. However, the agent could have accomplished his community caretaking responsibilities in a manner less intrusive to the Defendant's interest in not being blocked in and effectively detained. The agent, for instance, could have asked the Defendant to move his pickup truck into a designated parking spot. The agent's exercise of his community caretaking function was not reasonable considering the circumstances. Accordingly, the agent's exercise of his community caretaking duties by parking behind the Defendant's pickup truck and activating his overhead lights did not constitute a continuation of the initial consensual encounter between the agent and the Defendant.

> 2. Was the initial encounter consensual even if the Defendant could not drive his pickup truck out of the Burger King parking lot because Defendant was allowed to go about his business, i.e., get breakfast and use the restroom?

Although the Fourth Amendment cases regarding consensual encounters often refer to whether a reasonable person would not feel free to leave the scene or go about his or her business, the essential test of whether an encounter is consensual is whether "a reasonable person would feel free to terminate the encounter...." *Drayton*, 122 S.Ct. at 2110. Under the circumstances of this case, allowing a person to get breakfast and use the restroom alone would not lead a reasonable person to conclude that he or she could terminate the encounter with the agent. Rather, the fact that the Defendant's pickup truck was blocked in by a car with its overhead lights activated and the fact that the Defendant knew the agent had called the canine unit would lead a reasonable person to believe that he or she was not free to terminate the encounter. Once the agent blocked the Defendant's pickup truck, the encounter ceased to be consensual.

6

3. Was blocking the Defendant's pickup truck a Terry or investigative stop requiring reasonable suspicion?

Since the initial encounter between the agent and the Defendant was no longer consensual once the agent blocked the Defendant's pickup truck, the next issue is whether the ensuing detention was justified for investigative purposes. An investigative stop, or Terry stop, must be supported by the officer's reasonable articulable suspicion that "criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989), *quoted in Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). "Based on the totality of the circumstances, the detaining officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Oliver*, 209 F.3d at 1186 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750-51 (2002). In reaching a reasonable suspicion determination, the officer may consider together factors which alone are susceptible to innocent explanations. *Id.* at 753.

The Defendant argues that when the agent blocked the Defendant's pickup truck he had no articulable reason to believe that the Defendant may have been committing a crime. The record, however, provides several factors known to the agent which support a reasonable suspicion that the Defendant was either illegally smuggling aliens or drugs. Those factors are: 1) Defendant was traveling northbound, away from Mexico on U.S. Highway 54; 2) there recently had been increased smuggling of aliens and drugs on U.S. Highway 54 because the permanent

7

checkpoint on U.S. Highway 54 had been closed; 3) the Defendant appeared to be hiding his face from the agent when the agent first looked at him; 4) the Defendant's pickup truck had an out-of-state license plate; 5) the Defendant had traveled into Mexico two times within the previous 72 hours; 6) the Defendant appeared to be trying to evade the agent by going into and immediately exiting the Wendy's parking lot; and 7) the Defendant did not park within the parking space lines when he pulled into the Burger King parking lot. These factors when considered collectively are sufficient under *Arvizu* to constitute an articulable reasonable suspicion that the Defendant was engaged in alien or drug smuggling. The agent, therefore, properly detained the Defendant for investigative purposes.

4. Did the initial stop develop into an arrest requiring probable cause?

The Defendant argues in the alternative that even if there were an articulable reasonable suspicion for an investigative stop, the agent exceeded the scope of the stop when he failed to let the Defendant leave after checking his citizenship, driver's license, and vehicle registration, and after inspecting the inside of the pickup truck and visually inspecting the exterior of the pickup truck. The Defendant apparently argues that once the agent completed the search of the interior of the pickup truck and visually inspected the exterior of the pickup truck, the agent placed the Defendant under a custodial arrest without probable cause to believe that the Defendant had committed or was committing a crime.

An arrest is "characterized by highly intrusive or lengthy search or detention." *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir.), *cert. denied*, 467 U.S. 1255 (1984). In this case, the Defendant's detention was not lengthy. Approximately 10 minutes to at the most 45 minutes passed from the time the agent finished his inspection of the pickup truck until the canine

8

unit arrived. This amount of time was reasonable in order for the agent obtain the canine unit for investigative purposes. *See United States v. Burton*, 288 F.3d 91, 101-02 (3rd Cir. 2002)(30-45 minute wait for canine unit was reasonable in the context of an investigative stop); *United States v. Shareef*, 100 F.3d 1491, 1507 (10th Cir. 1996)(detention of Defendants in handcuffs for 45 minutes did not transform investigative search into an arrest). The detention was also not very intrusive. The Defendant was allowed to get breakfast and use the restroom while waiting for the canine unit to arrive. In addition, the agent did not possess the pickup truck keys, the Defendant's driver's license, or the pickup truck's registration. Moreover, the Defendant was not handcuffed during this time. I find that the Defendant was not under arrest prior to the dog alerting to the rear end of the pickup truck and the discovery of the marijuana. Instead, the Defendant just continued to remain detained for investigative purposes.

      5. Was the search of the pickup truck conducted without the effective consent of the Defendant?

The Defendant argues that he acquiesced to the search of the pickup truck because of express and implied duress and coercion. The Defendant also argues that even if there were consent, it was tainted by his initial illegal detention. Finally, the Defendant argues that even if he had consented to the search, poking a hole in the spare tire exceeded the scope of his consent, thus requiring a warrant to search the tire.

"[T]he government bears the burden of proving that consent 'was freely and voluntarily given.'" *United States v. Sandoval*, 29 F.3d 537, 539 (10th Cir. 1994)(citations omitted). The determination of whether consent was voluntary is based on an evaluation of the totality of the circumstances. *United States v. McRae*, 81 F.3d 1528, 1536-37 (10th Cir. 1996). "[T]he

9

government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1993).

Consent, however, need not be conveyed verbally. *See, e.g., United States v. Gordon*, 173 F.3d 761, 766 (10th Cir.), *cert. denied*, 528 U.S. 886 (1999). *See also United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999)("A defendant's silence and acquiescence may support a finding of voluntary consent."). "[T]he dispositive issue is whether a reasonable law enforcement officer would have understood defendant's actions to indicate her voluntary consent to the search." *United States v. Flores*, 48 F.3d 467, 469 (10th Cir.), *cert. denied*, 516 U.S. 839 (1995). Moreover, the Tenth Circuit has recognized that although a detained person may experience "some degree of compulsion to acquiesce to an officer's request," there must also be other evidence of duress or coercion to show a lack of voluntary consent. *Id.; Soto*, 988 F.2d at 1558.

I will assume for the purposes of this discussion only that the Defendant did not verbally agree to the agent's initial search of the Defendant's pickup truck and the subsequent canine inspection. Even so, the Defendant has failed to present any evidence of duress or coercion to support his allegation that he was involuntarily forced to acquiesce in the agent's requests to search the pickup truck. There is no evidence of factors like "physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant." *See United States v. Glover*, 104 F.3d 1570, 1583-84 (10th Cir. 1997). In addition, there is no evidence that the agent used a commanding manner or tone of voice or that there was more than one officer present at the time consent was

sought. The encounter also occurred in the daylight alongside a busy street. Considering the totality of the circumstances, I find that the United States has carried its burden of demonstrating that the Defendant's silence and acquiescence constituted voluntary consent to search the Defendant's pickup truck. Furthermore, as discussed above, the Defendant was legally detained by the agent for investigative purposes. Consequently, the Defendant cannot argue that an illegal detention tainted any consent he gave to the agent to search the pickup truck.

The Defendant, however, argues that the agent and the canine unit officer exceeded the scope of any consent he gave to the agent by puncturing the spare tire. In evaluating the scope of a detainee's consent, the courts apply an objective reasonableness test: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The Tenth Circuit has held that "a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent." *Gordon*, 173 F.3d at 766.

The evidence at the state suppression hearing demonstrates that the Defendant gave the agent general consent through his acquiescence to search the backseat area of the pickup truck and to perform a canine inspection of the pickup truck. The agent did indeed search the backseat area of the pickup truck and had a canine unit officer conduct a canine inspection of the pickup truck. The evidence does not indicate that the Defendant objected to the agent and the canine unit officer poking a hole in the spare tire. However, in *United States v. Osage*, the Tenth Circuit held that "before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit

authorization, or have some other lawful, basis upon which to proceed." *Osage*, 235 F.3d 518, 522 (10th Cir. 2000)(opening of cans labeled as containing tamales exceeded scope of consent). Arguably, *Osage* could be distinguished from this case because a spare tire is not a container like the tamale cans in *Osage*. *See United States v. Felix*, 12 Fed. Appx. 827 (10th Cir. 2001)("The *Osage* case speaks only to containers, not to parts of a vehicle itself" like a gas tank). In that situation, a reasonable person would conclude that the agent and the canine unit officer did not exceed the scope of the Defendant's consent by searching the contents of the spare tire.

Alternatively, the Eleventh and Eighth Circuits found in cases similar to this one that even if an officer exceeded the scope of consent to search an entire vehicle by slashing a spare tire, the officer could nonetheless slash a spare tire if he or she had probable cause to search the spare tire under the automobile exception to the Fourth Amendment's warrant requirement. *United States v. Alverez*, 235 F.3d 1086, 1088-89 (2000), *cert. denied*, 532 U.S. 1031 (2001); *United States v. Strickland*, 902 F.2d 937, 941-43 (11th Cir. 1990). *Osage* is in accord with those cases because the Tenth Circuit would permit destruction of a container to search for contraband if there is "some other, lawful, basis" for the search. *Osage*, 235 F.3d at 522. In this case, the dog alerted to the rear end of the vehicle. The canine unit officer and his dog were looking at the spare tire that was mounted underneath the pickup truck. The agent and the canine unit officer noticed that the spare tire would not fit on the pickup truck wheels. They then pressed against the tire and could feel bundles, not air inside the tire. Based on the agent's training and experience, he believed that there were narcotics in the spare tire. These facts are sufficient to show that the agent and the canine unit officer also had probable cause to believe contraband was inside the tire, justifying their poking a hole in the spare tire to confirm that the tire contained narcotics. *See*

12

*Alverez*, 235 F.3d at 1088-89; *Strickland*, 902 F.2d at 941-43.

      6. Conclusion

      Once the agent blocked the Defendant's pickup truck and activated the overhead emergency lights of his car, the encounter between the agent and the Defendant ceased to be consensual. The agent, however, thereafter lawfully detained the Defendant for investigative purposes until the dog alerted to the pickup truck and the marijuana was discovered. Furthermore, the Defendant gave his voluntary consent for the agent to search the pickup truck and have a canine inspection of the pickup truck performed. Finally, after establishing probable cause to believe the tire contained drugs, the agent and the canine unit officer were justified in poking a hole in the spare tire.

      IT IS ORDERED that Defendant's Motion to Suppress (Doc. No. 19) is denied.

                                                           _____
                                                            CHIEF UNITED STATES DISTRICT JUDGE